## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT PANZER**, individually and on behalf all others similarly situated, | |
| Plaintiff, | |
| *v.* | Civil Action No. |
| **VERDE ENERGY USA, INC.**, and **OASIS POWER, LLC.**, | **CLASS ACTION COMPLAINT** |
| Defendants. | |

Plaintiff, Scott Panzer ("Plaintiff" or "Mr. Panzer"), brings this action against Defendants, Verde Energy USA, Inc. and Oasis Power, LLC (collectively, "Defendants").

### NATURE OF THE CASE

1.      Deregulation changed the way electricity is sold to consumers.  When utilities were the only players in the market, they supplied and distributed electricity to consumers and, under extensive regulations, set the retail rates.  Now, consumers, hoping to save on their power bills, have a choice of who supplies their electricity.

2.      Unfortunately, some unscrupulous electricity suppliers have taken advantage of deregulation.  Certain suppliers exploit the lack of regulatory oversight by engaging in deceptive marketing practices and price gouging to profiteer at the expense of unsuspecting consumers.  Defendants are two such suppliers.

3.      This action arises from Defendants' deceptive, bad-faith, and unfair pricing practices that have caused thousands of consumers to pay considerably more for electricity than they should have.

1

4.      Defendants are participants in the retail electricity markets.  Defendants purchase electricity supply from the wholesale market and resell that electricity to retail consumers.

5.      In order to lure customers into purchasing their electricity supply, Defendants promise to use their extensive industry expertise to offer "competitive" variable rates that reflect wholesale costs and market conditions.

6.      In reality, Defendants' variable rates are not competitive, are invariably substantially higher than those otherwise available in the electricity market, and do not reflect wholesale costs or market conditions.

7.      As a result, unsuspecting consumers have been fleeced out of millions of dollars in exorbitant charges for electricity.

## **PARTIES**

8.      Plaintiff is a citizen of Pennsylvania, residing in Media, Pennsylvania.  Mr. Panzer was a customer of Defendants.

9.      Defendant, Oasis Power, LLC, d/b/a Oasis Energy, ("Oasis"), is a Texas corporation with its principal place of business located at 12140 Wickchester Lane, Houston, Texas.  Oasis, thus, is a citizen of Texas.  Spark Energy, LLC, whose principal pace of business is also 12140 Wickchester Lane, Houston, Texas, purchased Oasis in 2015.

10.     Defendant, Verde Energy USA, Inc. ("Verde"), is a Texas corporation with its principal place of business in Texas, also at 12140 Wickchester Lane, Houston.  Verde, thus, is a citizen of Texas.  Spark Energy, LLC purchased Verde in 2017.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action under 28 U.S.C. § 1332(d), the "Class Action Fairness Act."  Minimal diversity of citizenship exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

12.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claim occurred here. Specifically, Defendants supplied Plaintiff with, and overcharged Plaintiff for, electricity in this district.

## OPERATIVE FACTS

**History and Structure of Electricity Deregulation**

13.     States across the country began deregulating their retail energy supply markets in the 1990's.  For example, Pennsylvania's Electricity Generation Customer Choice and Competition Act, or "the Choice Act," was passed in 1996.  66 Pa. C.S. §§ 2801 *et seq.*, § 2801 (title).

14.     Deregulation was intended to bring about greater consumer choice, as well as lower rates and more flexibility.  *See, e.g.,* 66 Pa. C.S. § 2802 (declaration of legislative policy).

15.     Deregulation enables retail energy supply companies to be more competitive, aggressive, and creative than monopolistic utilities in reducing wholesale purchasing costs, thereby lowering prices for retail customers.  The public policy motivation in Pennsylvania and other states for allowing consumers a choice of energy suppliers is to enable retail customers to financially benefit from the increased competition between suppliers in the open market by paying lower rates for energy supply.

16.    Pennsylvania refers to the relatively new retail electricity suppliers, including Defendants, as "electric generation suppliers," "electricity suppliers," or "EGSs."  66 Pa. C.S. § 2803.

17.    Under the Choice Act, EGSs supply the electricity, while local utilities continue to deliver electricity to consumers and manage billing.  Generally, the local utility becomes the "default service provider" for people who do not choose an alternative supplier.  *Id*.  Consumers who do not choose to switch to an EGS for their energy supply continue to receive their supply from their local utility.  Deregulation laws in other states are substantially similar.  As a result, the local utilities are EGSs' primary competitors.

18.    Utilities charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely ancillary services, transmission, line losses, capacity, and administrative costs (*i.e.*, the same costs EGSs such as Oasis and Verde incur) -- without any markup or profit.  Because utility rates do not include any profits, they serve as reflections of market costs of wholesale electricity and associated costs.

19.    Unlike heavily-regulated utilities, EGSs have many options to buy electricity at wholesale for resale to retail customers, including: owning their own electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer (the "spot" market); and by purchasing electricity in advance of the time it is used by consumers (the "futures" market).

20.    Because of their increased flexibility, EGSs should be able to offer rates competitive with -- if not substantially lower than -- the utilities' rates, and many do.

21.    Indeed, while Plaintiff was a customer of Oasis and then Verde, those companies offered fixed rates that were competitive with, or much lower, than the incumbent utility's rates.

22.     As part of deregulation, EGSs do not have to file or seek approval for their electricity supply rates or their pricing methodologies.

23.     Defendants Oasis and Verde exploit deregulation's lack of regulatory oversight by deceptively charging consumers exorbitant rates.  In fact, Oasis and Verde's rates were substantially higher than rates charged by other EGSs and local utilities, and they do not reflect their costs to purchase electricity on wholesale markets.

**Plaintiff's Dealings with Oasis and Verde**

24.     Mr. Panzer's local utility is PECO.

25.     On August 24, 2015, Mr. Panzer signed up for electricity service from Great American Power, LLC, an EGS (not a defendant here).  The rate was to be fixed for 24 months at 6.99¢ per kilowatt-hour (kWh).

26.     When Mr. Panzer's fixed rate expired, he was transferred to the variable rate, and the Great American uniform customer agreement provided that variable rate "will be set by us each month based on our evaluation of a number of factors that may include the cost of electricity available in the PJM and PECO area including ancillary services, transmission, line losses, capacity, renewable energy, and other costs incurred related to the procurement of electricity.  We may also evaluate the recovery of extreme spot market electricity cost changes."

27.     Upon information and belief, Great American's customer agreement with customers in other states and utility regions are the same, other than the identification of the relevant local utility.  The Oasis and Verde customer agreement provisions related to variable rates are also materially the same, as they also require that the variable rate reflect market conditions.  Thus, all of Defendants' variable rate customers, whether operating under the Great

American customer agreement or Defendants' customer agreements, require that the variable rate be reflective of wholesale costs and market prices.

28.    On April 26, 2017, prior to the expiration of the 24 month fixed rate period, Mr. Panzer received a notice that his contract was being assigned to Oasis.

29.    The notice stated: "**NO ACTION REQUIRED:** Your service will continue under your current service agreement without interruption."  Later in the notice, it reiterated that, "Oasis Energy will honor your current agreement in place with Great American Power and there will be no changes to the terms or conditions through the life of your current contract."

30.    The notice further stated: "Oasis Energy is run by an experienced team of energy experts with decades of retail energy supply and utility experience.  The Oasis Energy team's experience in deregulated energy markets enables them to offer **highly competitive prices**, and friendly customer service."  (Emphasis added.)

31.    In September 2017, when the fixed rate expired, Oasis transitioned Mr. Panzer to its variable rate, which was and remained significantly higher than the 6.99¢/kWh fixed rate.

32.    Oasis also inexplicably began charging Mr. Panzer a $6.95 monthly fee. However, the Great American customer agreement only allows the rate to be based on the above-specified factors.  It does not authorize Defendants to charge any other fees.

33.    In June 2018, Oasis informed the Pennsylvania Public Utility Commission of its intent to assign its contracts to Verde and, in approximately July 2018, Oasis and Verde sent Mr. Panzer and all other Great American customers a uniform letter regarding his contract's assignment.

34.    The joint letter, signed by Nathan Kroeker, also the president and chief economic officer for Spark Energy (*i.e.*, Oasis and Verde's parent company), stated that nothing would

change about the arrangement with Mr. Panzer.  In particular, it guaranteed, "Verde will honor your current agreement in place with Oasis and there will be no changes to the terms or conditions through the life of your current contract."  It further stated: "Verde is run by an experienced team of energy experts with decades of retail energy supply and utility experience. The Oasis Energy team's experience in deregulated energy markets enables them to offer competitive prices, and friendly customer service."

35.     However, immediately after Mr. Panzer's contract was assigned to Verde in August 2018, the monthly fee was raised again, this time to $9.99.

36.     In November 2018, Mr. Panzer noticed that his electricity rates were far above the market rates and canceled his service with Verde.

37.     Mr. Panzer's customer agreement provided that the variable rate would be based on wholesale costs.  Oasis and Verde subsequently pledged that, despite the assignment, they would abide by his existing contract's terms and provide "competitive prices" using their extensive electricity industry expertise.

38.     Any reasonable consumer would understand based on this language that Defendants' variable rate would in fact be competitive, and that it would reflect local wholesale and retail electricity market prices.

39.     Indeed, any reasonable consumer would understand that the primary, if not sole, components of procurement costs are wholesale prices, and that "competitive prices" are to be measured against the retail supply rates local competitors (*i.e.*, the local utility and other EGSs) charge.

40.     Notwithstanding the plain meaning of the representation, Defendants' variable rates did not reflect wholesale electricity prices and were not competitive.  Instead, their variable

rates were substantially higher than both wholesale and retail market rates, and did not decrease when wholesale electricity market prices declined.

41.     The following table compares Mr. Panzer's electricity supply rates from October 2016 to December 2018 to his local utility's (PECO's) contemporaneous supply rate.

| Provider | Service Period | EGS's Rate per kWh | Utility's Rate per kWh | Percent Difference |
|----------|----------------|--------------------|------------------------|--------------------|
| Great American | 10/24/16 to 11/22/16 | 6.99¢ | 7.76¢ | -9.92% |
| Great American | 12/27/16 to 1/30/17 | 6.99¢ | 7.47¢ | -6.43% |
| Great American | 1/30/17 to 2/27/17 | 6.99¢ | 7.47¢ | -6.43% |
| Great American | 2/27/17 to 3/28/17 | 6.99¢ | 7.16¢ | -2.37% |
| Great American | 3/28/17 to 4/26/17 | 6.99¢ | 7.16¢ | -2.37% |
| Great American | 4/26/17 to 5/26/17 | 6.99¢ | 7.16¢ | -2.37% |
| Great American | 5/26/17 to 6/09/17 | 6.99¢ | 7.11¢ | -1.69% |
| Oasis | 6/26/17 to 7/26/17 | 6.99¢ | 7.11¢ | -1.69% |
| Oasis | 7/26/17 to 8/24/17 | 6.99¢ | 7.11¢ | -1.69% |
| Oasis | 8/24/17 to 9/22/17 | 6.99¢ | 7.13¢ | -1.96% |
| | *[Fixed rate expired here]* | | | |
| Oasis | 9/22/17 to 10/23/17 | 13.33¢ | 7.13¢ | 86.94% |
| Oasis | 10/23/17 to 11/21/17 | 15.53¢ | 7.13¢ | 117.87% |
| Oasis | 11/21/17 to 12/22/17 | 15.53¢ | 7.22¢ | 115.15% |
| Oasis | 12/22/17 to 1/26/18 | 15.53¢ | 7.22¢ | 115.15% |
| Oasis | 1/26/18 to 2/26/18 | 15.53¢ | 7.22¢ | 115.15% |
| Oasis | 2/26/18 to 3/27/18 | 15.53¢ | 7.10¢ | 118.79% |
| Oasis | 3/27/18 to 4/25/18 | 15.53¢ | 7.10¢ | 118.79% |
| Oasis | 4/25/18 to 5/24/18 | 16.48¢ | 7.10¢ | 132.12% |
| Oasis | 5/24/18 to 6/25/18 | 16.59¢ | 7.15¢ | 132.03% |
| Oasis | 6/25/18 to 7/25/18 | 16.59¢ | 7.15¢ | 132.03% |
| Verde | 7/25/18 to 8/23/18 | 16.59¢ | 7.15¢ | 132.03% |
| Verde | 8/23/18 to 9/24/18 | 16.59¢ | 6.81¢ | 143.61% |
| Verde | 9/24/18 to 10/23/18 | 16.59¢ | 6.81¢ | 143.61% |
| Verde | 10/23/18 to 11/16/18 | 12.49¢ | 6.81¢ | 83.41% |

42.     As soon as Mr. Panzer's fixed rate expired and Oasis transitioned him to its variable rate, Oasis nearly doubled his rate from the 6.99¢/kWh fixed rate to 13.33¢/kWh -- a rate that rose as high as 16.59¢/kWh shortly thereafter.  When the contract was assigned in July

2018, Verde picked up where Oasis left off, continuing to charge Mr. Panzer inexplicably and egregiously high variable rates.

43.     The "Percent Difference" column demonstrates the drastic difference between Defendants' rates and PECO's contemporaneous rates. The difference between the rates exceeded 100% in virtually every month -- meaning that Oasis's and Verde's variable rates were *more than double* the utility's rates. On average, Oasis's variable rates were *118% higher* than the utility's rate, and Verde's variable rates were *126% higher* than the utility's rate. In no month was the variable rate competitive with the utility rate.

44.     Moreover, PECO's supply rate, charged to those customers who do not select an EGS, reflects market prices. As PECO explains, its prices "for electricity supply, which are based in part on the current wholesale cost of electricity, change quarterly as market prices change."[1]  PECO also notes that its supply price "will vary in future periods due to changes in consumption patterns as well as changes in PECO's cost of supply. The prices of electricity and natural gas fluctuate, and these changes affect the cost of supply" and PECO's supply rates.[2]

45.     The disconnect between PECO's rates and Defendants' rates further demonstrates that Defendants' rates did not reflect their costs to purchase electricity, as promised in Mr. Panzer's customer agreement. For example, between November 2017 and August 2018, PECO's rates declined from 7.22¢/kWh to 6.81¢/kWh (decreasing by about 6%), while Defendants' variable rate steadily rose from 15.53¢/kWh to 16.59¢/kWh (increasing by about 7%). Thus,

---

[1] *About the Electric Price To Compare*, PECO, https://www.peco.com/MyAccount/MyService/Pages/ElectricPricetoCompare.aspx (last visited July 26, 2019).

[2] *Frequently Asked Questions*, PECO, https://www.peco.com/MyAccount/CustomerSupport/Pages/FAQs.aspx (last visited July 26, 2019).

changes in wholesale costs caused PECO's rates to decline during the same period that Defendants' rates rose, even though Defendants should have been able to procure electricity at a lower cost than the utility given their tactical advantage over PECO. As explained above, Defendants can purchase electricity from any number of markets using a variety of purchasing and hedging strategies. Their cost for purchasing electricity, therefore, should have *at least* reflected, if not undercut, PECO's prices.

46.     Indeed, Defendants represented that they were sophisticated, skilled purchasers of electricity. Their letter to Mr. Panzer touted that its executives had "decades of retail energy supply and utility experience" and would use that to produce their "competitive" rates.

47.     Moreover, Mr. Panzer's customer agreement specifically provided that the variable rate would be based on electricity costs in the PECO area. Any reasonable consumer would thus expect and understand that the variable rate would be competitive with the default supply rates PECO charged, particularly given that PECO's supply rates reflect wholesale price changes in the local area and that PECO is the primary competitor. Unfortunately, Defendants' did not honor their obligations to consumers and the rates charged were not remotely competitive with local utility rates.

48.     Plaintiff relied on Defendants' promises that they would honor the terms of the Great American customer agreement and that they would charge competitive rates. But for these representations, Plaintiff would have terminated Defendants' services before they could have charged him a variable rate.

49.    Defendants' high rates were not competitive with those of other EGSs, either. According to the U.S. Energy Information Administration's data, in 2017, Verde's average rate was higher than 88% of the other EGSs selling electricity in Pennsylvania.[3]

50.    Notably Verde, which along with Oasis is owned by Spark Energy, did not change its variable rate methodology after it acquired Mr. Panzer's contract from Oasis in 2018 (as reflected in the fact that the variable rate itself did not change).

51.    Notwithstanding that the customer agreement required Defendants to set rates based on PJM wholesale market prices,[4] Defendants' variable rates did not vary according to wholesale market prices.

52.    The following table identifies the billing periods during which Mr. Panzer was enrolled in Defendants' variable rate, Defendants' variable rates for each billing period, and the contemporaneous wholesale market price for electricity available in the PJM area.  Defendants are capable of purchasing electricity at wholesale at these prices, and given their purportedly vast experience, they likely purchased wholesale electricity at lower costs.

---

[3] *2017 Retail Power Marketers Sales–Residential*, U.S. ENERGY INFORMATION ADMIN.,http://bit.ly/2pgWXpO (last visited June 14, 2019).

[4] PJM (or PJM Interconnection) is a neutral, independent party that operates a competitive wholesale electricity market in Pennsylvania and other states in the Northeast.

| Provider | Service Period | Defendants' Rate per kWh | Wholesale Price per kWh |
|---|---|---|---|
| **Oasis** | 9/22/17 to 10/23/17 | 13.33¢ | 4.34¢ |
| **Oasis** | 10/23/17 to 11/21/17 | 15.53¢ | 4.72¢ |
| **Oasis** | 11/21/17 to 12/22/17 | 15.53¢ | 7.04¢ |
| **Oasis** | 12/22/17 to 1/26/18 | 15.53¢ | 14.01¢ |
| **Oasis** | 1/26/18 to 2/26/18 | 15.53¢ | 4.45¢ |
| **Oasis** | 2/26/18 to 3/27/18 | 15.53¢ | 4.60¢ |
| **Oasis** | 3/27/18 to 4/25/18 | 15.53¢ | 5.42¢ |
| **Oasis** | 4/25/18 to 5/24/18 | 16.48¢ | 4.32¢ |
| **Oasis** | 5/24/18 to 6/25/18 | 16.59¢ | 4.30¢ |
| **Oasis** | 6/25/18 to 7/25/18 | 16.59¢ | 5.22¢ |
| **Verde** | 7/25/18 to 8/23/18 | 16.59¢ | 5.22¢ |
| **Verde** | 8/23/18 to 9/24/18 | 16.59¢ | 4.66¢ |
| **Verde** | 9/24/18 to 10/23/18 | 16.59¢ | 5.24¢ |
| **Verde** | 10/23/18 to 11/16/18 | 12.49¢ | 5.57¢ |

53.    For example, from April 2018 to June 2018, the wholesale cost of electricity declined from 5.42¢/kWh to 4.3¢/kWh, a decrease of more than 20%.  At the same time, Oasis's rate increased from 15.53¢/kWh to 16.59¢/kWh, an increase of 7%.  Similarly, the wholesale electricity prices declined from September to October 2018, from 5.22¢/kWh to 4.66¢/kWh, an 11% decline, while Verde's rate remained steady at 16.59¢/kWh -- *i.e.*, 256% higher than the wholesale price.

54.    Indeed, Defendants' variable rate only ever increased, first from 13.33¢/kWh to 15.53¢/kWh in November 2017.  It remained at 15.53¢/kWh for seven months while the market fluctuated each month, until May 2018, when the variable rate increased to 16.48¢/kWh, and then to 16.59¢/kWh the following month, where it would stay until October 2018 (shortly before Mr. Panzer terminated his service with Verde).

55.    No reasonable customer, including Mr. Panzer, would expect that Defendants could interpret "costs incurred related to the procurement of electricity" to mean that they could exercise unfettered discretion to artificially inflate their rates, beyond any resemblance to

wholesale costs or competitors' rates, in order to maximize their profits at the expense of its customers. Indeed, the fact that Defendants' rates were triple or quadruple wholesale market prices demonstrates the extent of their unscrupulous price gouging.

56.     No reasonable consumer would understand or expect that a rate based on wholesale electricity costs in the PJM area would be three to four times higher than those costs.

57.     Defendants' representation that they would "honor your current agreement" when they assumed customer agreements was knowingly false and misleading. Defendants knew that their variable rates did not reflect their costs to procure electricity for their customers, nor did their rates reflect electricity prices in the PJM area. Indeed, Mr. Panzer's rate instantly doubled when he was switched to the variable rate, even though the wholesale market rate at the time only increased 5% from the prior month.

58.     Defendants further deceived their variable rate customers by charging them monthly fees in direct contravention of the terms of the Great American Power contract they promised to uphold. The contract did not mention monthly fees. To the contrary, the customer agreement specifies the basis for monthly charges to customers, namely the variable rate based on the cost of procurement and prices in the PJM area. Consequently, Mr. Panzer never assented to Defendants' monthly fees.

59.     Defendants' statements regarding their electricity rates were materially misleading because the most important consideration for any consumer choosing an energy supplier is price: all electricity is electricity.

60.     No reasonable consumer who knew the truth about Defendants' exorbitant rates would choose them as an electricity supplier.

61.     Other than potential price savings, there is nothing to differentiate Defendants from other EGSs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Defendants.  The commodity is the same regardless of the supplier.

62.     Defendants induced consumers into purchasing their electricity supply by intentionally misrepresenting their electricity rates as being competitive and predicated on market conditions, when they knew that their rates were unconscionably high.  Defendants did so in order to reap outrageous profits at the expense of unsuspecting consumers.  Defendants acted with actual malice or wanton and willful disregard for the well-being of consumers.

## **Rule 9(b) Allegations**

63.     To the extent necessary, Mr. Panzer has satisfied the requirements of Fed. R. Civ. P. 9(b) by establishing the following elements with sufficient particularity:

64.     WHO:

•       Defendants, acting through their corporate personnel, made material misrepresentations and omissions of fact in the letters they sent to customers when assuming contracts with residential customers held by other EGSs.

65.     WHAT:

•       Defendants made material misrepresentations and omissions by promising customers that they would honor prior contractual agreements that the variable rate would be based on market prices and costs when they knew that their variable rate was not based on such prices and costs.

- Defendants made these misrepresentations even though they knew their variable rate would not vary based on market conditions or be competitive with local competitors' rates.

- Defendants engaged in additional misrepresentations and omissions in their solicitations by falsely and deceptively stating that they would uphold the Great American Power contract, which did not authorize them to charge a monthly fee. Nevertheless, Defendants intended to impose a fee.

66. WHERE:

- In Defendants' letters, which represented that they would charge a competitive rate and abide by the terms of Mr. Panzer's original contract.

67. WHEN:

- Defendants made material misrepresentations and omissions on April 26, 2017, and again on June 13, 2018, when they informed Mr. Panzer that they would honor Great American's contract and charge a competitive rate. Defendants made the same or substantially similar misrepresentations and omissions of material facts to all of their customers by using the same or substantially similar communications.

68. WHY:

- Knowing that price is the most fundamental factor in choosing an energy supplier, Defendants promised to honor these contractual terms with the purpose of inducing Mr. Panzer and other prospective customers to use their electricity supply services. By deceptively inducing customers to use their energy supply,

Defendants have successfully reaped millions in profits at the expense of their unsuspecting customers.

69.    HOW:

•    Defendants make material misrepresentations and fail to disclose material facts concerning their variable rate when marketing, advertising, promoting, and selling electricity services by representing that they would charge a variable rate that is competitively-priced and based on market prices and conditions.  In reality, Defendants made no effort to price their variable rate competitively with either local utilities or competing EGSs.  There was no correlation between Defendants' variable rate and market conditions.  Instead, their rate was disconnected to changes in the wholesale electricity market, consistently higher than PECO's and other EGSs' contemporaneous rates, and was invariably higher than their own teaser and fixed rates.

•    Defendants also failed to disclose that they charge customers a monthly fee, and nevertheless charged their customers monthly fees.

**Class Action Allegations**

70.    Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Mr.

Panzer brings this action on his own behalf and on behalf of the following class:

> All residential and commercial consumers in the United States charged a variable rate for electricity by Verde Energy USA, Inc. or Oasis Power, LLC (the "Class").

71.    Excluded from the Class are: Defendants; any parent, subsidiary, or affiliate of a

Defendant; any entity in which a Defendant has or had a controlling interest, or which a

Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of a Defendant.

72.    This action is brought as a class action for the following reasons:

a.    The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.    There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

i.    whether Defendants breached their contracts by charging variable rates not based on the cost of procurement;

ii.    whether Defendants breached their promises to charge competitive rates;

iii.    whether Defendants acted deceptively and unfairly by promising to charge competitive rates and honor existing contracts when they had no intention of doing so;

iv.    whether Defendants breached the covenant of good faith and fair dealing by exercising their unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Defendants' variable rates would be based on the cost of procurement and be competitive;

v.    whether Defendants violated state-law deceptive trade practices acts;

vi.    whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

vii.    whether Defendants should be enjoined from continuing to charge exorbitant rates based on factors other than as agreed in the contracts.

c.     The claims asserted by Plaintiff are typical of the claims of Class members, as Mr. Panzer's customer agreement was materially the same as other Class members' agreements and Defendants use a uniform method to set the variable rate;

d.     Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and EGSs;

e.     Prosecuting separate actions by individual class members could create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants;

f.     Defendants have acted on grounds that apply generally to the Class, namely representing that their variable rates are based on the cost of procurement and are competitive, so that final injunctive relief prohibiting Defendants from continuing their deceptive practices is appropriate with respect to the Class as a whole;

g.     A class action is superior to all other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.     Absent a class action, class members as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain their ill-gotten gains;

ii.     It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions, or such actions simply would not be brought;

iii.     When Defendants' liability has been adjudicated, the Court will be able to determine the claims of all members of the Class;

iv.     A class action will permit an orderly and expeditious administration of claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

v.     This action presents no unusual difficulties that would impede its management by the Court as a class action; and

vi.     Defendants have acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

### COUNT 1:
### Breach of Contract and
### Breach of the Implied Covenant of Good Faith and Fair Dealing

73.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

74.     Plaintiff and the Class were bound by valid contracts with Defendants for the provision of electricity supply.

75.     Pursuant to those contracts, Defendants were required to charge a variable rate based on market prices and conditions.

76.     Pursuant to the contract, Plaintiff and all Class members agreed to pay Defendants' rate, and did so.

77.     However, Defendants failed to perform their obligations under the contract, because their rates were not based on market prices and conditions.

78.     Defendants further breached their contract by charging Plaintiff and Class members monthly fees, absent any contractual authority to do so.

79.     Plaintiff and all Class members were damaged as a result because they were billed, and they paid, more for electricity than Defendants were authorized to charge.

80.     Additionally, inherent in every contract is an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

81.     Plaintiff and Class members reasonably expected that Defendants would attempt to make a reasonable profit in setting rates and selling electricity to consumers.  However, Plaintiff also reasonably expected that the variable rate would reflect market conditions and be competitive with utility prices, including competing rates and the wholesale price of electricity, and that Defendants would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendants.

82.     Defendants breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising their unilateral rate-setting discretion to price-gouge and frustrate Plaintiff and Class members' reasonable expectations that the variable rate for electricity would reflect market conditions and the cost of procurement, including competing rates and wholesale electricity prices.

83.     As a result of Defendants' breaches, they are liable to Plaintiff and members of the Class for damages and attorney's fees.

### COUNT 2:
### Violation of the Pennsylvania Unfair Trade Practices
### and Consumer Protection Law,
### 73 P.S. § 201-1, *et seq.*

84.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

85.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("CPL")
prohibits "unfair or deceptive acts or practices."  73 P.S. § 201-3.

86.     The CPL defines unfair or deceptive acts or practices to include any fraudulent or
deceptive conduct which creates a likelihood of confusion or misunderstanding.  73 P.S. § 201-
2(4)(xxi).

87.     Defendants' affirmative representations, misrepresentations, and omissions
alleged above constitute the requisite "unfair or deceptive acts or practices" to support a violation
of the CPL.

88.     In particular, Defendants' promises to uphold legacy contract terms, Defendants'
promises to base their rates on the costs of procurement and local utility prices, and Defendants'
assurances that their rates would be "competitive" were all fraudulent and deceptive practices.

89.     Defendants' illegally charged and collected monthly fees also violated the CPL.
Defendants failed to inform customers that they would charge a monthly fee, in contravention
with customer agreements.

90.     Plaintiff and Class members relied on Defendants' promises that they would
honor the terms of the legacy customer agreements and that they would charge competitive rates.
But for these representations, Plaintiff and Class members would have terminated their service
before they could have been charged a variable rate by Defendants.

91.     Therefore, Plaintiff and Pennsylvania Class members are entitled to actual
damages or one hundred dollars ($100), whichever is greater.  73 P.S. § 201-9.2(a).  Plaintiff and
Pennsylvania Class members are further entitled to have their actual damages trebled to an
amount of not less than one hundred dollars ($100).  *Id*.

92.     Plaintiff and Pennsylvania Class members are further entitled to their costs and reasonable attorney fees.  *Id*.

93.     Plaintiff and Pennsylvania Class members are also entitled to an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, and any other necessary or proper relief available under the Pennsylvania CPL.

## COUNT 3:
## Violation of Similar Consumer Protection Laws

94.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

95.     Verde and Oasis sell retail electricity in at least seven other states, in addition to Pennsylvania: Connecticut, Massachusetts, New Jersey, New York, Maryland, Illinois, and Ohio.

96.     As applied to relevant circumstances each of these states has a consumer protection law that is substantially similar to the Pennsylvania CPL.

97.     By engaging in the above-described conduct, Oasis and Verde have engaged in actionable deceptive and unfair trade practices in these other states.

98.     Accordingly, Defendants are liable for violating the consumer protection laws in these other states.

99.     Because he stands in a similar position to consumers in the other states, Mr. Panzer can fairly represent all Class members as a class representative.

100.    Defendants are liable to members of the Class for damages under the laws of each state, including compensatory and multiple damages, and attorney fees and costs.

## COUNT 4:
## Unjust Enrichment

101.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

102.    Plaintiff and Class members conferred a tangible economic benefit upon Defendants by contracting with Defendants for electricity.

103.    Plaintiff and the Class members would not have contracted with Defendants for electricity had they known that Defendants would charge rates substantially in excess of those charged by other market participants and would not have based their rates on the wholesale cost of electricity.

104.    By engaging in the conduct described above, Defendants unjustly enriched themselves and received a benefit beyond what was contemplated by the parties, at the expense of Plaintiff and Class members.

105.    It would be unjust and inequitable for Defendants to retain the payments Plaintiff and Class members made for excessive electricity charges.

106.    Therefore, Defendants are liable to Plaintiff and Class members for the damages that they have suffered as a result of Defendants' actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendants as follows:

1.    Ordering appropriate injunctive relief;

2.    Certifying this action as a class action as defined above;

3.    Awarding damages as demanded in each Count, including compensatory damages, exemplary damages, attorney fees and costs, and pre- and post-judgment interest; and

4.    Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.


Dated:      August 8, 2019

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP


By:      /s/James C. Shah
James C. Shah
Natalie Finkelman Bennett
35 E. State Street
Media, PA 19063
Tel: 610-891-9880
Fax: 866-300-7367
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

Matt Schultz*
William F. Cash III*
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7000
mschultz@levinlaw.com
bcash@levinlaw.com

Greg Blankinship*
Chantal Khalil*
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
445 Hamilton Avenue, Suite 605
White Plains, New York 10601
Tel: (914) 298-3281
Fax: (914) 824-1561
gblankinship@fbfglaw.com
ckhalil@fbfglaw.com

* *Pro Hac Vice* Application Forthcoming


*Attorneys for Plaintiff and the Putative Class*