# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SCOTT PANZER, individually and on behalf of all others similarly situated,** | : | **CIVIL ACTION** |
| v. | : | |
| | : | |
| **VERDE ENERGY USA, INC. and OASIS POWER, LLC** | : | **NO. 19-3598** |

## MEMORANDUM OPINION

**Savage, J.**                                                                             **December 17, 2020**

The threshold issue in this putative class action is whether the plaintiff agreed to arbitrate his claims and waived a class action. The defendants contend that he agreed to arbitration when he accepted service from them after receiving two mailings of the electric service contracts, which included the agreement to arbitrate. The plaintiff denies receiving the letters containing the contract terms. In deciding this issue, we must apply the "mailbox" rule that provides that a letter properly deposited in the post office mailbox or with the postman is presumed to have been delivered to the addressee.

Plaintiff Scott Panzer brought this putative class action against his former energy suppliers for breach of contract and violations of various Pennsylvania consumer protection laws. After discovery limited to the question of whether the parties had agreed to arbitrate the dispute, defendants Verde Energy USA, Inc. ("Verde") and Oasis Power, LLC ("Oasis") renewed their motion to dismiss and compel arbitration. The defendants argue that Panzer cannot rebut the presumption of receipt of the defendants' terms of service containing the arbitration agreement under the mailbox rule. Panzer counters that he has rebutted the presumption of receipt.[1]

---

[1] The defendants also argue that Panzer's arguments concerning whether the defendants' notices of the change in contract terms satisfy the Pennsylvania Code and whether new consideration was provided

We conclude that Panzer has rebutted the presumption of receipt of the mailings containing the contracts. With the presumption gone, there is a dispute whether Panzer received the defendants' terms of service containing the arbitration agreement, creating an issue of fact that precludes a finding that he agreed to arbitration.[2] Therefore, we shall deny the defendants' motion to compel arbitration.

## Factual Background

In August 2015, Panzer entered into an agreement with Great American Power, LLC ("GAP") for electricity service at a fixed rate for 24 months.[3] The Disclosure Statement and Terms of Service (the "GAP Contract") and the contract summary included with the contract provided that GAP would send Panzer two notices approximately 30 and 60 days before the contract expired advising him of the contract's imminent expiration and his renewal options.[4] Neither the GAP Contract nor the summary contained an arbitration provision.[5]

In April 2017, prior to the expiration of the 24-month fixed rate period, GAP notified Panzer that it was assigning his contract to Oasis Power, LLC.[6] The notice advised that

---

to support the change in terms are arbitrable questions under the agreement's delegation clause. Panzer counters that the questions of statutory compliance and consideration are questions of formation for the court to decide. He also argues that the class action waiver contained in the defendants' terms of service is unconscionable.

[2] The remaining issues Panzer raises, the unconscionability of the class action waiver in the defendants' terms of service, whether new consideration was provided for the change in terms and whether the defendants complied with the notice requirements for changing the terms under Pennsylvania law, depend on the jury's findings.`

[3] Blankinship Decl. in Supp. of Pl.'s Opp. to Defs.' Renewed Mot. to Dism. Ex. 5 at ¶ 4 (ECF No. 63) ("Panzer Decl.").

[4] Blankinship Decl. Ex. 1 at ¶ 1 ("GAP Contract"); Blankinship Decl. Ex. 6 ("GAP Contract Summary").

[5] GAP Contract; GAP Contract Summary.

[6] Panzer Decl. at ¶ 5; Church Decl. in Supp. of Defs.' Renewed Mot. to Dism. Ex. A-13, Ex. A (ECF

2

Oasis would honor his current agreement with GAP, there would be no changes to the terms or conditions through the life of his current contract, and his service would continue under his current service agreement without interruption.[7]

When the fixed rate period expired on October 1, 2017, Oasis transferred Panzer to its variable rate.[8] Panzer continued to receive service at the variable rate and paid his invoices.[9]

In June 2018, Oasis sent Panzer a letter informing him that it was assigning his contract to Verde Energy USA, Inc (the "June 2018 letter").[10] The notice advised that there would be no change to the terms or conditions through the life of his current contract.[11] In November 2018, Panzer canceled his service with Verde because its rates were "extremely high."[12]

On August 8, 2019, Panzer filed this action against Oasis and Verde asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law and other consumer protection laws.[13] He alleges that the defendants took

---

No. 58) ("April 2017 letter").

[7] April 2017 letter.

[8] Church Decl. Ex. A-1 at 107:4-9, 158:1-3 ("Panzer Dep. Tr."); Church Decl. Ex. A-3 at Oasis_Verde00054.

[9] Panzer Dep. Tr. at 8:19-9:9, 110:9-19, 148:25-149:14, 150:4-11, 158:10-19; Church Decl. Ex. A-4 at Panzer 00034-44, 46-73.

[10] Church Decl. Ex. A-13, Ex. E ("June 2018 letter"); Panzer Dep. Tr. at 116:15-19.

[11] June 2018 letter.

[12] Panzer Dep. Tr. at 125:12-20, 149:22-150:3.

[13] Pl.'s Compl. at ¶¶ 73-106 (ECF No. 1).

3

advantage of Pennsylvania's deregulation of the electricity supply market to engage in deceptive marketing practices and to price gouge unsuspecting consumers.[14]

Invoking the arbitration clause in their terms of service, Oasis and Verde moved to dismiss or stay Panzer's putative class action.[15] They contend the arbitration provision contained in the terms of service requires arbitration of all disputes arising out of the relationship between the parties, and delegates all questions of the contract's formation, interpretation and arbitrability to the arbitrator.[16] Opposing the motion, Panzer contends he did not agree to arbitration and never received the terms of service containing the arbitration clause.[17]

On February 10, 2020, we denied the motion without prejudice and allowed limited discovery into whether Panzer had agreed to arbitrate his claims against the defendants.[18] On June 19, 2020, after limited discovery, the defendants filed their renewed motion to dismiss and compel arbitration.[19]

## Standard of Review

We apply the summary judgment standard to motions to compel arbitration. *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 216 (3d Cir. 2019) (citing *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 775 (3d Cir. 2013)).

---

[14] *Id.* at ¶¶ 13-23.

[15] Defs.' Mot. to Dism. (ECF No. 12).

[16] *Id.* at 3-5.

[17] Pl.'s Opp. to Defs.' Mot. to Dism. at 13-16 (ECF No. 27); Panzer Decl. at ¶¶ 7-13.

[18] Feb. 10, 2020 Order (ECF No. 37).

[19] Defs.' Renewed Mot. to Dism. (ECF No. 58).

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

A party moving for summary judgment may use depositions and affidavits or declarations to show a fact is not genuinely disputed, and a party opposing the motion may also rely on them to demonstrate that a fact is disputed. *See* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . affidavits or declarations."). Because depositions provide all parties an opportunity to probe the witness, they are preferred to declarations and affidavits that are generally prepared by attorneys rather than the declarant or affiant. *See In re CitX Corp.*, 448 F.3d 672, 680 (3d Cir. 2006) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRAC. & PROC. § 2722, at 373, 379 (3d ed. 1998)). The affiant must set forth specific facts that reveal a genuine issue of material fact. *Lujan v. National*

*Wildlife Fed'n,* 497 U.S. 871, 888 (1990) (collecting cases). Because they are not subject to cross-examination, affidavits are scrutinized carefully. *In re CitX Corp.,* 448 F.3d 672, 680 (3d Cir. 2006) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2722, at 373, 379).

**Discussion**

The defendants claim that Oasis sent Panzer contracts containing the arbitration agreement.[20] According to the defendants, Oasis mailed its fixed rate customers, including Panzer, a letter and a contract summary in September 2017 (the "September 2017 letter"). The letter gave customers three options: they could (1) renew their fixed rate contract with Oasis; (2) se lect another supplier; or (3) do nothing, automatically enrolling them in Oasis's variable rate plan.[21] The defendants claim that Oasis attached a four-page terms of service to the September 2017 letter.[22] The terms of service included the following arbitration provision:

> Any claim, dispute or controversy, regarding any contract, tort, statute, or otherwise ("Claim"), arising out of or relating to this Agreement or the relationships among the parties hereto shall be resolved by one arbitrator through binding arbitration . . . . Neither party shall sue the other party other than as provided herein or for enforcement of this clause or of the arbitrator's award . . . .[23]

The defendants contend that Oasis mailed Panzer a letter, a residential options notice and a contract summary in February 2018 (the "February 2018 letter").[24] The

---

[20] Defs.' Renewed Mot. at 1-2, 12.

[21] *Id.* at 1,12; Church Decl. Ex. A-3 at Oasis_Verde00056 ("September 2017 letter").

[22] Defs.' Renewed Mot. at 1-2, 7, 12; Church Decl. Ex. A-3 at Oasis_Verde00058-61.

[23] Church Decl. Ex. A-3 at Oasis_Verde00060, ¶ 11.

[24] *Id.* at OasisVerde_00063-66 ("February 2018 letter").

6

February 2018 letter reminded Panzer of the terms of his month-to-month variable plan.[25] It included another four-page terms of service.[26] The terms of service, although not identical to the terms of service sent with the September 2017 letter, were substantially similar. Both contracts contained identical arbitration agreements and almost identical class action waivers.[27] The defendants argue that because Panzer continued to accept Oasis's service and pay his bills, he agreed to the terms which included the arbitration provision.[28]

Panzer contends that he did not receive the September 2017 or February 2018 letters.[29] The defendants have produced testimonial evidence of their mail practices and documentary evidence showing that the letters were mailed to Panzer at his home address. Thus, the question is whether Panzer received the contract containing the arbitration provision.

Under the "mailbox rule," a letter properly deposited in a postal mailbox or with the postman is presumed to have been delivered to the addressee. *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 319 (3d Cir. 2014) (citing *Rosenthal v. Walker*, 111 U.S. 185,

---

[25] *Id.*

[26] *Id.* at OasisVerde_00067-70.

[27] *Id.* at OasisVerde_00069.

[28] Defs.' Renewed Mot. at 1-2.

[29] Pl.'s Resp. at 34-40. In addition to claiming he did not receive the September 2017 letter, Panzer contends that the mailing records do not establish that any terms of service were included with the September 2017 letter. *Id.* at 10-12, 27. Panzer does not dispute that documents containing an arbitration agreement were attached to the February 2018 letter. He disputes that he received the February 2018 letter and its contents. *Id.* at 34-37.
  He also contends that the class action waiver is unconscionable, Oasis failed to satisfy the notice requirements under 52 Pa. Code. § 54.10 for modifying energy contracts between suppliers and consumers and the terms of service lacked new consideration to support the addition of the arbitration provision, class action waiver, and "other onerous terms." *Id.* at 5, 19, 23-31, 33-34, 46-48.

193 (1884)). The presumption is a rebuttable one. It merely raises an inference of fact that may be challenged by the intended recipient's evidence of non-receipt. Hence, once challenged, receipt becomes a jury question. *Id.* (citing *Rosenthal*, 111 U.S. at 193-4).

Circumstantial evidence may be enough to establish receipt. *Id.* The sender may present evidence of business practices or office customs to show mailing. *Id.* This evidence may be presented by a sworn statement based upon personal knowledge of the mail procedures. *Id.* at 320.

The defendants have presented evidence raising a presumption of receipt. They primarily rely on the deposition testimony of Elo Nnabuife, the Senior Manager of Operational Excellence at Spark Energy, LLC, the parent company of Oasis and Verde.[30] Nnabuife, who supervised the mailroom during the 2017-2018 period,[31] explained that depending on volume and cost, Spark's mailroom sometimes prepares mailings in-house for the defendants and at other times outsources the job to Zytron, an outsider vendor.[32] The mailing of the September 2017 letter was done in-house under Nnabuife's direct supervision, and the February 2018 letter was mailed by Zytron.[33]

For in-house mailings, the mailroom employees use a Windows application called OPS Admin that connects to a database storing customers' information.[34] OPS Admin generates lists of customers by contract expiration dates and prepares a customer report

---

[30] Blankinship Decl. Ex. 7 at 7; Church Decl. Ex. A-2 at 30:3-4 ("Nnabuife Dep. Tr.").

[31] Nnabuife Dep. Tr. at 34:8-22, 168:23-25.

[32] *Id.* at 86:8-11.

[33] *Id.* at 71:5-9, 153:6-14, 170:17-171:1.

[34] *Id.* at 46:1-2, 46:19-47:2, 47:11-16.

8

based on templates in the system.[35] Mailroom employees review the customer reports each morning and schedule the printing of the notices.[36] If the print volume is large, they use machines to prepare the mailings that create a record in the system.[37] OPS Admin coordinates the machines to print the notices, fold them, stuff the envelopes, and affix the postage.[38] The mailroom employees place the finished envelopes in trays for USPS pick up.[39] The envelopes are sent by first class mail.[40] There are no return receipts or tracking records.[41]

Nnabuife testified that the mailroom employs several quality control measures. The machine that prints and stuffs the envelopes checks the finished envelopes for any issues, such as two envelopes stuck together.[42] The mailroom employees also count the finished envelopes to ensure the number of envelopes matches the customer report.[43] At the end of the month, the mailroom creates an exception report to verify that the correct number of customers were mailed the notices.[44] If the report shows a discrepancy,

---

[35] *Id.* at 40:14-41:1, 45:5-10.

[36] *Id.* at 45:11-15.

[37] *Id.* at 45:15-18. For smaller print jobs, the mailroom employees prepare the mailings manually. *Id.*

[38] *Id.* at 50:20-23, 53:15-23, 56:8-10, 170:18-20.

[39] *Id.* at 50:23-25.

[40] *Id.* at 58:7.

[41] *Id.* at 58:7-12.

[42] *Id.* at 53:15-19.

[43] *Id.* at 51:4.

[44] *Id.* at 51:9-18.

another mailing is directed to the affected customers.[45] If there is a problem with the customer's address or the postage, USPS returns the envelope the next day with a note identifying the issue.[46] If possible, the mailroom fixes the issue, for example by correcting the address or adding more postage.[47] Nnabuife testified that records of all undelivered mail are kept.[48]

When Zytron does a mailing, the defendants send Zytron a mail merge request, a template and a customer list in a zip file.[49] Zytron creates individual letters for each customer, stuffs the envelopes, adds postage and mails the letters.[50] Zytron confirms the mailing by sending Nnabuife a PDF of the entire mail merge containing the mailed documents for all customers on the list.[51]

Nnabuife testified that the September 2017 letter, including the terms of service, was sent to Panzer using Spark's in-house mailing procedures.[52] He claimed that he distinctly remembers mailing the September 2017 letter to Panzer because Panzer's name stood out as uncommon.[53] The February 2018 letter to 8,643 customers in Pennsylvania, who included Panzer, was outsourced to Zytron.[54] Zytron confirmed the

---

[45] *Id.* at 51:19-22.

[46] *Id.* at 53:24-54:2, 59:23-60:1.

[47] *Id.* at 53:24-54:2, 60:1-3.

[48] *Id.* at 60:7-18.

[49] Church Decl. Ex. A-14 at ¶ 4 ("Lyons Decl."); Nnabuife Dep. Tr. at 85:12-16, 161:12-13.

[50] Lyons Decl. at ¶ 4.

[51] *Id.*

[52] Nnabuife Dep. Tr. at 168:25-169:2

[53] *Id.* at 175:1-2, 177:2-6, 177:8-178:21, 185:25-186:5.

[54] *Id.* at 80:20-81:4; Lyons Decl. at ¶¶ 5-6; Church Decl. Ex. A-5 at OasisVerde_00010-11.

mailing on March 6, 2018.[55] Nnabuife checked the mail merge records from Zytron and confirmed there was no mail intended for Panzer returned, nor any documentation of issues about Panzer receiving mail.[56] He verified that the mailings were sent to the address where Panzer had received other correspondence from GAP and the defendants, and that Panzer had not submitted a change of address.[57] He explained that customers' contacts with the defendants, such as customer service calls, are documented in OPS Admin.[58] There are no notes regarding returned or unprocessed mail for Panzer in the system.[59]

These mail procedures raise a presumption that Panzer received the September 2017 and February 2018 letters. However, the presumption is a weak one because the letters were sent by regular mail with no direct proof of delivery. *See Lupyan*, 761 F.3d at 320. The presumption is strong only when the letter is sent by registered or certified mail because there is evidence of receipt at the intended address. *See id.*

Once the sender proves mailing, the burden shifts to the intended recipient to produce evidence rebutting the presumption of receipt. The amount of evidence necessary to overcome the presumption differs under the federal rule and the Pennsylvania rule. It is minimal under the federal rule. The addressee's denial of receipt

---

[55] Lyons Decl. at ¶¶ 6-7; Nnabuife Dep. Tr. at 172:11-173:1; Church Decl. Ex. A-5 at OasisVerde_00003-00006.

[56] Nnabuife Dep. Tr. at 58:20-59:4, 61:11-12, 136:17-19, 149:14-15, 169:6-21.

[57] *Id.* at 56:21-57:6, 149:16-17, 19-21.

[58] *Id.* at 61:16-62:4.

[59] *Id.* at 61:23-63:3.

11

is sufficient. *Id.* at 321. Even a self-serving, non-conclusory affidavit or testimony based on personal knowledge is enough. *Id.* at 320-21.

Why the presumption is rebuttable arises from the realities of the mail delivery system. The Postal Service, like any other delivery business, is not perfect. Mistakes happen. Human error can result in misplaced, lost or misdelivered mail. Mechanical failure can result in failed delivery. Sorting or posting machines can malfunction. Many times there is no way to know how or why mail did not reach its intended recipient's address. Consequently, beyond denying he received the mail, the addressee would be forced to prove a negative.

The *Lupyan* court made it clear that "evidence sufficient to nullify the presumption of receipt under the mailbox rule may consist solely of the addressee's positive denial of receipt, creating an issue of fact for the jury." *Id.* at 321. If the intended recipient produces evidence to rebut the presumption, the presumption disappears, "leaving only that evidence and its inferences to be judged against the competing evidence and its inferences to determine the ultimate question at issue.'" *Id.* at 320 (quoting *McCann v. Newman Irrevocable Trust,* 458 F.3d 251, 287–88 (3d Cir. 2006)). In other words, once rebutted, the presumption is gone.

Pennsylvania requires more, but not significantly much more. The addressee cannot merely deny receipt. *See Com., Dep't of Transp., Bureau of Driver Licensing v. Grasse*, 606 A.2d 544, 545 (Pa. Commw. 1991) (citing *Dep't of Transp. v. Brayman Construction Corp.–Bracken Construction Co.,* 513 A.2d 562 (Pa. Commw. 1986)); *Samaras v. Hartwick*, 698 A.2d 71, 73-74 (Pa. Super. 1997). Instead, he may explain how he processes mail he receives and describe his effort to find the mailings. *See Carnathan*

*v. Ohio Nat. Life Ins. Co.*, No. 06-999, 2008 WL 2578919, at *5 (M.D. Pa. June 26, 2008).[60]

Applying either the federal or Pennsylvania rule yields the same result here. Panzer has carried his burden under both. He described how he receives and processes his mail. He has lived at the same address for 27 years.[61] He has a standard mailbox.[62] He has never asked a neighbor to collect his mail.[63] Nor has he had mail held at the post office for the past five years.[64] He testified that he and his wife both check the mail and put aside any items related to bills or other financial information.[65] His practice is to open everything, including junk mail, and scan all important or potentially important documents, such as bills, contracts, receipts and other pieces of mail.[66] For the past ten years, he has used a software program called Neat to organize and store his scanned documents in

---

[60] The majority of cases applying the Pennsylvania mailbox rule focus on the evidence needed to establish the presumption, but few consider what evidence is sufficient to defeat it. In cases where the court found the addressee did not rebut the presumption, the intended recipient only denied receipt of the mailed item, without more. *See, e.g., Samaras*, 698 A.2d at 73-74; *Bracy v. Macy's Retail Holdings, Inc.,* No. 19-3825, 2020 WL 1953647, at *6 (E.D. Pa. Apr. 23, 2020); *State Farm Fire & Cas. Co. v. Petroleum Heat & Power Co.*, No. 13-6732, 2016 WL 5816182, at *7 (E.D. Pa. Oct. 5, 2016); *Gedid v. Huntington Nat. Bank*, No. 11-1000, 2012 WL 691637, at *6 (W.D. Pa. Feb. 10, 2012), *report and recommendation adopted*, No. 11-1000, 2012 WL 691614 (W.D. Pa. Mar. 2, 2012).

[61] Panzer Dep. Tr. at 15:21-16:2.

[62] *Id.* at 16:22-25.

[63] *Id.* at 85:11-14.

[64] *Id.* at 85:4-10.

[65] *Id.* at 17:1-15.

[66] *Id.* at 11:22-25, 12:15-13:3, 17:19-24; Panzer Decl. ¶¶ 2-3.

folders.[67] If he does not deem a piece of mail important enough to scan, he discards it after reviewing it.[68] He keeps hard copies of certain legal documents, such as his will.[69]

Panzer testified that he scans relevant information from utility carriers.[70] He reads, saves and acts upon any utility-related mail that requires action.[71] He scanned and saved the summary page from his GAP customer agreement but discarded the full terms of service after reading it because the summary page contained all of the relevant information.[72] He scanned the April 2017 letter informing him that his contract was assigned from GAP to Oasis.[73] After searching through his Neat system, his email, his wife's email, his online PECO account and his hard copy files, he has no record of receiving the September 2017 or February 2018 letters.[74] He testified that it is not possible that his wife threw the letters away without him knowing because she always gives anything marked "Oasis" to him.[75] In short, he denied receiving the letters.

Panzer's denial of receipt of the letters is sufficient to destroy the presumption under the less stringent federal rule. *Lupyan*, 761 F.3d at 321. His testimony about his practices for receiving mail and his unsuccessful efforts to locate the letters also satisfy

---

[67] *Id.* at 11:24-12:7.

[68] *Id.* at 18:4-10.

[69] *Id.* at 24:14-20, 178:3-4.

[70] *Id.* at 12:15-18, 14:15-17, 26:13-17

[71] *Id.* at 134:18-23.

[72] *Id.* at 10:5-9, 10:23-25, 13:12-16, 26:23-27:3.

[73] *Id.* at 35:4-18, 67:12-15. He received, but did not scan or save, the June 2018 letter. *Id.* at 116:15-19, 158:19-160:4. When asked, he stated that he was not sure why it was not saved. *Id.* at 160:14.

[74] *Id.* at 23:5-24:7, 57:13-22, 58:17-20, 60:17-61:2, 136:18-137:6, 178:5-10; Panzer Decl. ¶¶ 7-8.

[75] Panzer Dep. Tr. at 138:3-5.

the heightened Pennsylvania rule. *See Carnathan*, 2008 WL 2578919, at *5 ("Just as Ohio National relies upon its business practices with respect to billing and mailing in its effort to invoke the mailbox rule, Plaintiff relies upon the business practices of his company, Colonial Electric Service, to rebut the presumption.").

Because there is a factual issue whether Panzer received the September 2017 and February 2018 letters, we cannot conclude that he agreed to arbitrate his claims against Oasis and Verde. Nnabuife's and Panzer's credibility is for a jury to decide. The jury must determine whether Panzer received the September 2017 and February 2018 letters.

Having concluded whether Panzer received the letters and agreements which included the arbitration provision is a disputed issue, we do not address whether the September 2017 letter contained the arbitration agreement. Nor need we reach the issues whether the arbitration agreement and class action waiver are unconscionable and preempted by federal law. These issues arise only if the jury finds that Panzer received the two letters containing the arbitration agreement and class action waiver.

The disputed issue at this stage raises a question whether Panzer is an adequate class representative under Federal Rule of Civil Procedure 23(a)(4). He essentially claims he is not a member of a class who agreed to arbitration. Yet, the class he seeks to represent did agree to arbitrate. His interests do not align with those whom he seeks to represent. Therefore, we shall require the parties to show cause why the class action allegations of the complaint should not be stricken.

## Conclusion

Genuine issues of material fact preclude a finding that Panzer agreed to arbitration and waived a class action. The jury must decide whether he received the September 2017 or February 2018 letters containing the agreement to arbitrate. His remaining arguments depend on the jury's determination. Therefore, we shall deny the defendants' motion to dismiss and decline to compel arbitration.